[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13139

_____

D. C. Docket No. 07-00053-CR-4-SPM-WCS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GENE FELIX AMBERT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(March 6, 2009)**

Before MARCUS, ANDERSON and CUDAHY,* Circuit Judges.

_____

* Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

MARCUS, Circuit Judge:

Defendant Gene Felix Ambert appeals from the district court's denial of his motion to dismiss the charges levelled against him for failing to register as a sex offender under the Sex Offender Registration and Notification Act ("SORNA") in violation of 18 U.S.C. § 2250(a). Ambert argues that he is not bound by the criminal provisions of SORNA. He also challenges the constitutionality of SORNA on the grounds that it violates the non-delegation doctrine, the ex post facto clause, the commerce clause, his procedural and substantive due process rights, and his right to travel. After thorough review, we conclude that Ambert as a sex offender is bound by SORNA, that the statute is constitutional on its face and as applied to him, and accordingly we affirm.

I.

The essential factual and procedural history is not disputed. Ambert was convicted in California in February 1975 of Crimes Against Children and sentenced to five years' probation. On December 1, 2005, Ambert completed a Sex Offender Registration form in California, pursuant to Cal. Penal Code § 290, acknowledging among other things that he had a lifetime requirement to update his sex offender registration each year within five days of his birthday, and if he moved to a new state, to register within ten days in the new state and notify California within five days of

2

the move. Ambert failed to register in California during 2006, and likewise failed to register in Florida after having moved to Tallahassee, Florida.

Ambert moved from California to Tallahassee, Florida in early 2006. A year and a half later, on July 4, 2007, the Tallahassee Police Department investigated a lewd and lascivious act committed against a child, and this investigation led them to the defendant Ambert. In the course of the investigation, the police confirmed that Ambert was the sole resident of a house in Tallahassee, Florida, and also discovered that he was listed as having absconded from California's Sex Offender Registry. On July 6, 2007, an arrest warrant for Ambert was issued, charging him with failure to register as a sex offender as required by Fla. Stat. § 943.0435.[1]

Ambert traveled from Florida back to California on July 9, 2007. He returned to Florida on July 11, 2007 and was arrested in Jacksonville. On September 18, 2007, Ambert was charged in a superseding federal indictment filed in the United States District Court for the Northern District of Florida with traveling in interstate commerce to Florida, and failing to register with the State of Florida, under the Sex Offender Registration and Notification Act, in violation of 18 U.S.C. § 2250(a).

---

[1] Florida Statute § 943.0435 requires, inter alia, that sex offenders register in person at the sheriff's office in the county in which they have a permanent or temporary residence within 48 hours of establishing a residence in Florida.

3

Ambert moved to dismiss the indictment, arguing that the indictment was improper because Congress did not intend SORNA to apply to his offense based on his dates of travel. Moreover, he claimed that SORNA was unconstitutional because the statute amounted to: 1) an excessive delegation of legislative authority; 2) an impermissible ex post facto law; 3) a violation of the commerce clause; 4) a violation of his procedural and substantive due process rights; 5) an impermissibly vague travel requirement; and 6) a violation of his right to travel.

Soon thereafter, the district court denied the defendant's motion to dismiss. Ambert entered a conditional plea of guilty pursuant to an agreement that allowed him to preserve the right to appeal the denial of his motion to dismiss. See Fed. R. Crim. P. 11(a)(2). On April 21, 2008, he was sentenced to a thirty-seven month term of imprisonment and a twenty-five year term of supervised release. This timely appeal followed.

II.

We review a district court's denial of a motion to dismiss for abuse of discretion. See United States v. Madera, 528 F.3d 852, 854 (11th Cir. 2008). However, this appeal raises a number of issues concerning statutory interpretation and constitutional law, which we review de novo. United States v. Castro, 455 F.3d 1249, 1251 (11th Cir. 2006).

4

SORNA was enacted in July 2006 "to protect the public from sex offenders and offenders against children . . ." by establishing "a comprehensive national system for the registration of those offenders." 42 U.S.C. § 16901. Indeed, the statute was designed "to track the interstate movement of sex offenders." United States v. Howell, 552 F.3d 709, 716 (8th Cir. 2009). Pertinent to the resolution of this appeal, SORNA § 16913 delineates when and how a sex offender must register under the Act. It states:

> (a) In general
>
> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.
>
> (b) Initial registration
>
> The sex offender shall initially register -- (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or (2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.
>
> (c) Keeping the registration current
>
> A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved

5

pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry. That jurisdiction shall immediately provide that information to all other jurisdictions in which the offender is required to register.

(d) Initial registration of sex offenders unable to comply with subsection (b) of this section

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

(e) State penalty for failure to comply

Each jurisdiction, other than a Federally recognized Indian tribe, shall provide a criminal penalty that includes a maximum term of imprisonment that is greater than 1 year for the failure of a sex offender to comply with the requirements of this subchapter.

42 U.S.C. § 16913.

SORNA also creates new penalties for individuals who, among other things, fail to register despite being required to do so. Section 2250(a) provides that:

(a) In general -- Whoever -- (1) is required to register under the Sex Offender Registration and Notification Act . . . (2)(B) travels in interstate or foreign commerce . . .; and (3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act . . . shall be fined under this title or imprisoned not more than 10 years, or both.

6

18 U.S.C. § 2250(a).

On February 28, 2007, in accordance with the congressional grant of authority given to him in 42 U.S.C. § 16913(d), the Attorney General enacted 28 C.F.R. § 72.3, which applied SORNA registration requirements "to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 28 C.F.R. § 72.3.

Initially, we observe that prior decisions of the Supreme Court and this Court dispose of Ambert's claims that SORNA does not apply to him or that it violates his due process rights, his right to travel, or the ex post facto clause. Nor are we persuaded that the codification of SORNA exceeds Congress' commerce clause power or that it amounts to an improper delegation of congressional power in violation of separation of powers principles.

A. SORNA's Applicability to Ambert

First, Ambert argues that § 2250 of Title 18 of the United States Code -- which made it a crime for anyone who "travels in interstate or foreign commerce" to knowingly fail to register or update a registration as required by SORNA -- does not apply to him because his relevant travel occurred before the Attorney General determined on February 28, 2007 that the statute's registration requirements apply to all offenders convicted before July 27, 2006. But, as the district court clearly

7

recognized, the indictment was based in part on Ambert's travel from Florida to California and back on July 9-11, 2007, well after the effective date of the statute. See United States v. Ambert, 2007 WL 2949476, at *5 (N.D. Fla. Oct. 10, 2007) (unpublished) ("Part of the date that Defendant is accused of violat[ing] SORNA is 'on or about July 11, 2007.'"). We agree with the trial court that § 2250 unambiguously applies to Ambert -- he had an obligation to register beginning on February 28, 2007 and traveled in interstate commerce after this date on July 9-11, 2007.

However, even if we were to assume arguendo that Ambert's relevant travel occurred before February 28, 2007, our recent decision in United States v. Dumont, _ F.3d. _, 2009 WL 161864 (11th Cir. Jan. 26, 2009), would be dispositive of Ambert's argument. In Dumont, a sex offender convicted of a qualifying offense before July 27, 2006, and who had traveled in interstate travel prior to February 28, 2007, was successfully prosecuted for failure to register as a sex offender under 18 U.S.C. § 2250 after February 28, 2007. On appeal, he challenged his conviction on the ground that his interstate travel occurred prior to the Attorney General's retroactivity determination. Id. at *1-*2. A panel of this Court squarely rejected this challenge. We concluded that 28 C.F.R. § 72.3 imposed upon all sex offenders convicted prior to July 27, 2006 an obligation to register under §16193 beginning on

"February 28, 2007, the date of the Attorney General's retroactivity determination." Id. at *2 (citing Madera, 528 F.3d at 857). We observed that "§ 2250 criminalizes a sex offender's failure to register [under SORNA] after traveling in interstate or foreign commerce, and the 'travels' language provides a jurisdictional basis." Id. at *3 (emphasis added). We held that "the fact that Dumont's travel to Florida occurred prior to the retroactivity determination does not preclude his prosecution [under § 2250 of SORNA]," id., and concluded that Dumont violated § 2250 on March 5, 2007 when he: (a) had an obligation to register under SORNA's general registration requirements; (b) had previously traveled in interstate travel; and (c) had not registered within three business days once he had an obligation to register and had traveled in interstate commerce. Id. at *3-*4.

Under the case law, Ambert had an obligation to register under SORNA beginning on February 28, 2007 and his failure to do so formed a proper foundation for a charge levelled under 18 U.S.C. § 2250.

B. Ex post Facto Clause

Ambert also claims that SORNA violates the ex post facto clause, U.S. Const. art. I, § 9, cl. 3, because it imposed on him a retroactive duty to register and enhanced the punishment for his 1974 conviction. Our decision in Dumont controls the resolution of this issue, conclusively rejecting this ex post facto argument. In

9

Dumont, we determined that SORNA did not impose a retroactive duty to register for prior convicted sex offenders or punish a defendant for actions that occurred prior to February 28, 2007. Rather, SORNA imposed a duty to register beginning on the date of the Attorney General's retroactivity determination (February 28, 2007), and a violation of the Act only occurred thereafter when the defendant failed to register after the date the statute became applicable. Dumont, 2009 WL 161864, at *3.

In this case, the superseding indictment charged not only that Ambert failed to register after the effective date of the Attorney General's retroactivity determination, but also that he performed every action necessary for prosecution -- i.e., failing to register as required and traveling in interstate travel -- after the effective date of the Attorney General's retroactivity determination. The application of SORNA to these facts does not violate the ex post facto clause.

C. Due Process

Ambert says that SORNA violates his substantive and procedural due process rights. The crux of the due process claim is the suggestion that the statute violated Ambert's rights when it caused his name to be placed on a sex offender registry without first providing him with a hearing to assess the risk of recidivism and current dangerousness, or with the opportunity to challenge his prior conviction.

10

The Supreme Court's precedent reviewing an analogous Connecticut sex offender registry in <u>Connecticut Department of Public Safety v. Doe</u>, 538 U.S. 1 (2003), essentially forecloses Ambert's procedural due process claim, and our precedent reviewing an analogous Florida sex offender registry in <u>Doe v. Moore</u>, 410 F.3d 1337 (11th Cir. 2005), eviscerates his substantive due process claim.

In <u>Connecticut Department of Public Safety v. Doe</u>, the petitioner -- a purportedly non-dangerous sex offender -- brought a § 1983 action challenging provisions of Connecticut's sex offender registry law, which required an offender to register and the Department of Public Safety to post a sex offender registry containing registrants' names, addresses, photographs, and descriptions on an Internet Website and make the registry available to the public. The petitioner claimed that posting this information without a hearing as to dangerousness or recidivism violated his right to procedural due process. The Court rejected the claim. It found that "the fact that respondent seeks to prove [in the hearing] -- that he is not currently dangerous -- is of no consequence under Connecticut's Megan's Law . . . [T]he law's requirements turn on an offender's conviction alone -- a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." 538 U.S. at 7.

As a result, the Court concluded that

> even if respondent could prove that he is not likely to be
> currently dangerous, Connecticut has decided that the

11

registry information of all sex offenders -- currently dangerous or not -- must be publicly disclosed. Unless respondent can show that that substantive rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise.

Id. at 7-8 (emphasis omitted). The fact that Ambert seeks to prove, that he is neither dangerous nor likely to be a repeat offender, is of no moment under SORNA, because the reporting requirements likewise turn on the offender's conviction alone -- a fact that he had a procedurally safeguarded opportunity to contest. Accordingly, we reject Ambert's procedural due process claim.

Although the Supreme Court declined to reach the substantive due process claim in Connecticut Department of Public Safety v. Doe because the appellant had waived it, we definitively rejected a substantive due process claim reviewing an analogous Florida statute in Doe v. Moore, 410 F.3d 1337 (11th Cir. 2005). In that case, ten sex offenders challenged the constitutionality of Florida's sex offender registration and notification scheme ("Sex Offender Act"), Fla. Stat. § 943.0435, which requires any sex offender in Florida to register in person within 48 hours of release from custody or temporary or permanent change in address, and also obliges the Department of Law Enforcement to publish the registry information. Appellants argued that Florida's Sex Offender Act violated their constitutional rights to due

process, equal protection, travel, separation of powers, and freedom from ex post facto legislation. A panel of this Court rejected each of these claims.

In addressing the appellants' substantive due process claim based on publication, we followed the two-step approach set forth by the Supreme Court in Washington v. Glucksberg, 521 U.S. 702 (1997), to determine whether the statute must be reviewed under strict scrutiny. First, we crafted a "careful description of the asserted right." Moore, 410 F.3d at 1343 (quotation omitted). Second, we determined "whether the asserted right is one of those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id. (quotations omitted). We determined that the right asserted was "the right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." Id. at 1344. And we concluded that this "right" was not deeply rooted in this Nation's history and tradition. Id. Thus, we found that only rational basis scrutiny applied, and that the restriction in the statute was rationally related to legitimate governmental interests, including protecting the public from recidivist sex offenders.

13

This Court's substantive due process analysis in <u>Moore</u> is equally applicable here. The same putative "right" of a sexual offender to refuse to register and to prevent publication is at issue in this case under a similar national registration statute, and the restrictions contained in the federal statute, similarly, are rationally related to Congress' legitimate goal in protecting the public from recidivist sex offenders. Moreover, as we observed in <u>Moore</u>, "a state's publication of truthful information that is already available to the public does not infringe the fundamental constitutional rights of liberty and privacy," <u>id.</u> at 1345, and therefore a convicted sex offender's inability to challenge his conviction before publication does not violate due process.[2]

D. <u>Right to Travel</u>

Ambert also claims that SORNA violates his right to travel because there are no sufficiently "weighty concerns" explicated in <u>Regan v. Wald</u>, 468 U.S. 222, 242 (1984), to justify the travel restrictions imposed by SORNA's registration requirements.

We addressed the burden imposed on the travel of sex offenders in our review of the Florida sex offender registry law in <u>Doe v. Moore</u>. There, a panel of this Court held that the requirement to notify Florida officials in person when changing

_____

[2] Ambert does not suggest that the information pertaining to his prior criminal history is inaccurate, nor for that matter does he challenge his underlying conviction.

permanent or temporary addresses did not violate the defendants' right to travel. Id. at 1348. We wrote:

> Though we recognize this requirement [to notify Florida officials in person when changing permanent or temporary addresses] is burdensome, we do not hold it is unreasonable by constitutional standards, especially in light of the reasoning behind such registration. The state has a strong interest in preventing future sexual offenses and alerting local law enforcement and citizens to the whereabouts of those that could reoffend. Without such a requirement, sex offenders could legally subvert the purpose of the statute by temporarily traveling to other jurisdictions for long periods of time and committing sex offenses without having to notify law enforcement.

Id. The same rationale applies here. The requirement to update a registration under SORNA is undoubtedly burdensome; however, the government's interest in protecting others from future sexual offenses and preventing sex offenders from subverting the purpose of the statute is sufficiently weighty to overcome the burden. This statute does not violate Ambert's right to travel.

E. Commerce Clause

Next, Ambert contends that Congress exceeded its commerce clause authority when it passed § 2250(a) of SORNA because the statute purportedly contains neither a sufficient nexus to commerce, nor a substantial effect on interstate commerce. We have not had occasion to address this issue, although several district courts in this

Circuit have done so. Most have found SORNA to be a proper regulation under Congress' commerce power. See, e.g., United States v. Robinson, 2008 WL 4086474, at *6 (S.D. Ga. Sept. 2, 2008) (unpublished); United States v. Elliott, 2007 WL 4365599, at *3 (S.D. Fla. Dec. 13, 2007) (unpublished); United States v. Cardenas, 2007 WL 4245913, at *12 (S.D. Fla. Nov. 29, 2007) (unpublished); and United States v. Mason 510 F. Supp. 2d 923, 932 (M.D. Fla. 2007). One district court, however, found that SORNA, 42 U.S.C. § 16913 and 18 U.S.C. § 2250, exceeded Congress' commerce clause authority. United States v. Myers, 2008 WL 5156671 (S.D. Fla. Dec. 9, 2008) (unpublished).

After thorough review, we conclude that Congress had the commerce power to enact SORNA. Congress' commerce clause power is derived from Article I, § 8 of the United States Constitution, which provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cls. 1 & 3. The Supreme Court in United States v. Lopez, 514 U.S. 549 (1995), synthesized and articulated the boundaries of this power. In Lopez, the Court addressed the constitutionality of the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q), which prohibited possession of a firearm within a thousand feet of a school. In striking down the statute, the Court observed that there were "three broad categories of activity that

16

Congress may regulate under its commerce power": (1) "Congress may regulate the use of channels of interstate commerce"; (2) "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." Id. at 558-59 (internal citations omitted).

Section 2250 is a proper regulation falling under either of the first two Lopez categories because it regulates both the use of channels of interstate commerce and the instrumentalities of interstate commerce. This Court further explained the proper boundaries of Congress' ability to regulate the channels and instrumentalities of interstate commerce in United States v. Ballinger, 395 F.3d 1218 (11th Cir. 2005) (en banc). In Ballinger, we reviewed among others, the constitutionality of a federal statute that criminalized church-based arson where the "offense is in or affects interstate or foreign commerce." Id. at 1224 (quoting 18 U.S.C. § 247(b)) (emphasis added). We upheld the statute against a commerce clause challenge, recognizing that "[p]lainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in

17

nature." Id. at 1226. We further observed that "Congress has repeatedly used this power to reach criminal conduct in which the illegal acts ultimately occur intrastate, when the perpetrator uses the channels or instrumentalities of interstate commerce to facilitate their commission." Id. "These channels of commerce are the interstate transportation routes through which persons and goods move. These channels include highways, railroads, navigable waters, and airspace." Id. at 1225-26 (internal citations and quotations omitted). It was the arsonists' movement in interstate commerce, rather than the nature of the harm, that was the linchpin of the analysis.

Section 2250 of SORNA easily meets these standards. Section 2250 makes it a federal crime to fail to register as required under 42 U.S.C. § 16913 only where the offender "travels in interstate or foreign commerce," or was convicted of a federal sex offense. Thus, even if we were to assume that the harms and targeted illegal conduct were purely local in nature, the use of the channels and instrumentalities of interstate commerce is necessarily part of the commission of the targeted offense under 18 U.S.C. § 2250. Plainly, § 2250 focuses on sex offenders, like the defendant, who travel in interstate commerce. In this focus, SORNA is analogous to a statute prohibiting church-based arson "in or affecting interstate or foreign commerce" upheld by this Court in Ballinger, and to the Mann Act prohibiting the transport of women "in interstate commerce" for an immoral purpose, upheld by the Supreme

18

Court long ago in Caminetti v. United States, 242 U.S. 470, 491 (1917). SORNA does no more than employ Congress' lawful commerce power to prohibit the use of channels or instrumentalities of commerce for harmful purposes. Moreover, as we made it clear in Ballinger, "[i]nstrumentalities of interstate commerce . . . are the people and things themselves moving in commerce." Ballinger, 395 F.3d at 1226. Thus, when a sex offender travels from one state to another, he is an instrumentality of interstate commerce, and by regulating these persons in SORNA, Congress has acted under its commerce clause power to regulate an instrumentality.

To the extent the defendant also suggests that § 16913 of SORNA violates the commerce clause, we remain unpersuaded. The Eighth Circuit Court of Appeals had occasion to address a similar commerce clause challenge to § 16913 in United States v. Howell, 552 F.3d 709 (8th Cir. 2009). The court upheld the constitutionality of this section. We agree with the Eight Circuit's reasoning and its conclusion.

It has been long recognized that Congress has the power to pass laws or regulations necessary and proper to carrying out their commerce clause power. In McCullough v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819), Chief Justice Marshall articulated the meaning of the necessary and proper clause, U.S. Const. art. I, § 8, cl. 18, in these enduring terms: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to

19

that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." Under this power textually conferred, Congress may regulate intrastate activity so long as the means employed by Congress are "reasonably adapted" to the attainment of a legitimate end under the commerce power. See United States v. Darby, 312 U.S. 100, 121 (1941).

As the Eighth Circuit recognized, in enacting § 16913 of SORNA, Congress did not focus on individual local registration as an end in itself, but rather as part of its goal to create a system to track and regulate the movement of sex offenders from one jurisdiction to another. See Howell, 552 F.3d at 716. Indeed, SORNA's introductory language makes it clear that SORNA was designed to create an interstate system to counteract the danger posed by sex offenders who slip through the cracks or exploit a weak state registration system by traveling or moving to another state without registering therein. Specifically, Congress has said that the purpose of the statute is "to protect the public from sex offenders and offenders against children" by "establish[ing] a comprehensive national system for the registration of those offenders." 42 U.S.C. § 16901 (emphasis added).

The jurisdictional wording of § 16913 similarly focuses on the movement of sex offenders across state borders and ensuring registration of offenders moving in this manner. See Howell, 552 F.3d at 716. Section 16913 requires sex offenders to

20

register and keep their registration current, "in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student"; requires a new or changed registration "in at least 1 jurisdiction" within three days of a change in the above status; and requires that jurisdiction to "immediately provide that information to all other jurisdictions" where the offender must register a change. 42 U.S.C. § 16913(a), (c). Finally, an examination of § 16913 and § 2250 makes the interstate focus abundantly clear. See Howell, 552 F.3d at 716. Notably, § 16913 does not contain a federal enforcement provision against individuals who fail to register locally. The only federal enforcement provision against individuals is found in § 2250, which explicitly subjects state sex offenders to federal prosecution under SORNA only if they "travel in interstate or foreign commerce" and fail to register under § 16913. 18 U.S.C. § 2250(2)(b).

Section 16913 is reasonably adapted to the attainment of a legitimate end under the commerce clause. The requirement that sex offenders register under § 16193 is necessary to track those offenders who move from jurisdiction to jurisdiction.

F. Non-delegation Doctrine

Finally, Ambert argues that Congress improperly delegated its legislative authority by allowing the Attorney General to determine the retroactive application of SORNA. In particular, he challenges SORNA § 16913(d), which reads this way:

21

> The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

42 U.S.C. § 16913(d).

The non-delegation doctrine is based on the principle of preserving the separation of powers between the coordinate branches of government. It is derived from Article 1, Section 1 of the Constitution, which states that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. And, the doctrine holds that "Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is [constitutionally] vested." Panama Ref. Co. v. Ryan, 293 U.S. 388, 421 (1935).

Many years ago, when non-delegation arguments were more commonly raised, the Supreme Court set forth the governing test for determining the constitutionality of a delegation of authority by Congress to another branch of government in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928). The Court observed that where Congress has provided an "intelligible principle" for the recipient of the

delegated authority to conform to, the legislative action will not amount to a forbidden delegation of legislative power.  Id. at 409.

In the eighty years since the promulgation of the test, the Court has clarified the meaning of an "intelligible principle" and articulated the boundaries of permissible delegation. In American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90 (1946), for example, the Court addressed the constitutionality of § 11(b)(2) of the Public Utility Holding Company Act of 1935. 15 U.S.C. § 79k(b)(2). The Court upheld the statute against a non-delegation challenge and found that it was "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." American Power & Light Co., 329 U.S. at 105; see also Mistretta v. United States, 488 U.S. 361, 372-73 (1989).

In Whitman v. American Trucking Associations, 531 U.S. 457 (2001), the Court addressed the constitutionality of § 109(b)(1) of the Clean Air Act. Section 109(b)(1) provided the Environmental Protection Agency with the discretion to set national ambient air quality standards (NAAQS) at levels "requisite to protect the public health."  42 U.S.C. § 7409(b)(1). Again, the Court upheld the statute against a non-delegation challenge finding that the requirement that the EPA set "requisite"

air quality standards "fits comfortably within the scope of discretion permitted by our precedent." Whitman, 531 U.S. at 475-76.

Indeed, since 1935, the Supreme Court has not struck down a single statute as an impermissible delegation of legislative power. See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 521, 542 (1935) (striking down § 3 of the National Industrial Recovery Act of June 16, 1933); Panama Ref. Co., 293 U.S. at 406, 430 (striking down § 9(c) of the National Industrial Recovery Act of June 16, 1933).

We are satisfied that Congress has provided the Attorney General with "intelligible principles" in the Sex Offender Registration and Notification Act. Congress has undeniably provided the Attorney General with a policy framework in § 16901 to guide his exercise of discretion under § 16913(d); and it has made a series of legislative judgments in §§ 16911, 16913, 16914 and 2250 that constrict the Attorney General's discretion to a narrow and defined category.

In the first place, Congress has broadly set policy goals that guide the Attorney General in how to apply his discretion. Congress created SORNA with the specific design to provide the broadest possible protection to the public, and to children in particular, from sex offenders. Section 16901 expressly sets forth the congressional purpose in these terms: "In order to protect the public from sex offenders and

24

offenders against children and in response to the vicious attacks by violent predators against the victims listed below, Congress in this chapter establishes a comprehensive national system for the registration of those offenders." 42 U.S.C. § 16901. By setting forth the broad policy goal of protecting the public and seeking a "comprehensive" national registry, Congress has suggested that the Attorney General should require pre-2006 sexual offenders to register to the extent that he determines it would contribute to the protection of the public and the comprehensiveness of a national sex offender registry.

A review of the legislative history likewise confirms the broad purpose of the statute. Senator Hatch, one of the Bill's co-sponsors, observed that there were 100,000 to 150,00 sex offenders who were failing to comply with state registration requirements, that the situation was "killing our children," and that SORNA would "get tough" on those persons and decrease the number of sex offenders violating registration requirements. 152 Cong. Rec. S8012, 8013 (daily ed. July 20, 2006). And, Representative Sensenbrenner stated that SORNA's registration and data requirements would "ensure that law enforcement agencies and America's communities know where sex offenders live and work . . . [and] make one thing clear to sex offenders across the country -- you better register, and you better keep the

information current, or you are going to jail." 152 Cong. Rec. H5705, 5722 (daily ed. July 25, 2006).

In the second place, Congress made virtually every legislative determination in enacting SORNA, which has the effect of constricting the Attorney General's discretion to a narrow and defined category. Thus, for example, Congress defined the crimes which necessitate registration (42 U.S.C. § 16911); where the offender must register (42 U.S.C. § 16913(a)); the time period for registration (42 U.S.C. § 16913(b)); the method of registration (42 U.S.C. § 16913(b),(c)); the nature of information that registrants must provide (42 U.S.C. § 16914(a)(1)-(7)); the elements of the new federal crime (18 U.S.C. § 2250(a)); and the penalty for violation (18 U.S.C. § 2250(a)). These legislative determinations, read in pari materia with § 16913(d), have informed the delegation to the Attorney General in a sufficiently clear way. The Attorney General is left only with the discretion to determine whether this statute and all of its attendant requirements articulated by the legislature apply to a particular, capped class of offenders -- i.e. those convicted prior to July 27, 2006. Congress has unambiguously delineated its general policy, the public agency which is to apply it, and the boundaries of the delegated authority.[3]

---

[3] It is also worth noting that in granting the authority to the Attorney General, Congress was surely aware of the Attorney General's prior experience and expertise to further guide and constrain him in the limited exercise of discretion under SORNA. In 2005, a year prior to SORNA's enactment, the Attorney General's office designed and created a national sex offender

26

In short, we hold that Ambert is bound by the Sex Offender Registration and Notification Act, and that §§ 16193 and 2250 of the statute are constitutional both facially and as applied.  Accordingly, we affirm.

**AFFIRMED.**

registration database as a "safety resource, identifying location information on sex offenders residing, working, and going to school not only in their own neighborhoods but in other nearby states and communities as well." United States Department of Justice, Dru Sjodin National Sex Offender Public Website, http://www.ojp.usdoj.gov/smart/pdfs/NSOPWFactSheet.pdf (A copy of the internet materials cited in this opinion is on file in the Clerk's Office. See 11th Cir. R. 36, I.O.P. 10.). By July 1, 2006, prior to the enactment of SORNA, all fifty states took some part in the national registry. The Attorney General stated that "[t]he full completion of the structure of the National Sex Offender Public Registry is very good news for parents and law enforcement officers nationwide," and he hailed the database as a "clear accomplishment on the side of protection" in the "constant effort to safeguard our children from sex offenders." Press Release, Department of Justice Office of Justice Programs, All 50 States Linked to Department of Justice National Sex Offender Public Registry Website (July, 3 2006), available at www.ojp.gov/newsroom/pressreleases/2006/BJA06041.htm (A copy of the internet materials cited in this opinion is on file in the Clerk's Office. See 11th Cir. R. 36, I.O.P. 10.).